Our first case this morning is King v. OPM. Mr. Dowd, we appreciate having your help on this one. Good morning, Chief Judge Rader. May it please the Court. My name is Matthew Dowd and I represent the petitioner, Catherine King. There are two main issues in this case that are mentioned in the briefs. The first is whether the Board properly applied the substantial evidence standard in reviewing OPM's decision. And the second goes to whether there's substantial evidence that Catherine presented that justifies her request for a waiver of the recovery of the OPR payments. Let's start off with the first point. There's no argument about financial hardship here, and yet the tax records that have been provided to us would seem to indicate that there could have been an argument to that effect. Why not? I don't disagree that there's a strong argument for financial hardship. As you probably can tell from the record, I didn't represent Ms. King or Catherine below, so I don't really know the decision on why that was done or why it wasn't done. But I think even so, I think there's a basis to include some of that consideration just in the general context of unconscionability. But I would like to start with the first point, if it pleases the Court, in terms of the substantial evidence standard itself. And here, what I think the Board did incorrectly was apply a standard that really is much higher than what substantial evidence calls for. And I review the decision below. But what we're looking at here is a question of just whether Catherine presented enough evidence to meet that low threshold, and all she had to do was present evidence sufficient for a reasonable mind to think that, given these circumstances, it would be unconscionable or against equity to make her repay. Well, I think the question, though, is if you've got a standard of review, then that's substantial evidence. But what you're reviewing is a substantive claim that is more difficult to prove. How do those two intersect? Your Honor, I think from an evidentiary standpoint, it's a difficult concept. And I think that's part of the reason why the Board's error. And when you look at what the Board said in its opinion, and this is A0003, basically the Board admitted, quote, new evidence that the appellant submitted for the first time on review presented the possibility, though not the certainty. And so by the Board's own language, they were looking for certainty that Catherine had presented enough evidence to show that it was unconscionable for her to make this payment back to OPM, even though Catherine had already transferred the majority of the funds to Diana, the intervener. Now, Mr. Dowd, I spent a long time trying to ascertain if the funds Catherine transferred were actually the funds she received from the government, one. And the second point is I had a hard time figuring out if Diana had received a double payment or not. Can you address both of those a bit? Yes, Chief Judge Rader. I will admit that the record isn't precisely clear. I mean, it's hard to tell to the penny what money went where. But I think there's no doubt, and this is mentioned in Vice Chair Wagner's defending opinion, that Diana had received at least $33,000 of the annuity payments that Catherine had received. So that money, I think, when Catherine had received it, was being transferred from her to either a court trust in Montana or to Diana's attorneys. And so I don't think there's any doubt that that amount of money has gone and been transferred to Diana. Now, on top of that, there are these settlement agreements, the 2004 settlement agreement and the 2008 settlement agreement. But what the Board did is when they, at least the Board in majority, read those settlement agreements, it was weighing the possible interpretations. It wasn't asking whether it was reasonable, based on those agreements, to conclude that the money had been transferred to... You're back into your argument. I'm still trying to ascertain if there was a double payment. I don't think there's any doubt that there's a double payment to Diana because the record is clear that Catherine has transferred at least $33,000 to Diana. And when you look at the timeline of events, you see that OPM... The double payment is that Catherine transferred $33,000 to Diana and then Diana also received payments from OPM. That's correct, Adrena. So you're saying that the $48,000 that Diana received incorporated the $33,000 figure, or would have incorporated that? It should have, but there are two... Basically, it's a triangle of a transfer of money. Right. I understand it. What I'm saying is that when they paid her $48,000, they were assuming she got zero. Correct? When OPM? Yes. When OPM paid Diana $48,000? Yes. They were assuming she had zero. So at that point, the total that would have been due to anybody, the total due, was $48,000? Yes. Okay. So she got $48,000 plus she got this extra $33,000. Yes. I think that's part of... When you look at the timeline of events of what happened here, when OPM made that payment to Diana after the Montana State Court resolved the marriage issue, OPM was long on notice that there was a dispute about the funds. I think just looking at the timeline here, at least the earliest that OPM knew about competing claims to the annuity of payments was October 2006. As long as we're on a timeline, there's an important issue that the government raises, and that has to do with when Catherine made the request for the annuity payments in the first instance. As of the time she submitted the request, did she know at that point that she was not legally authorized to act as his spouse? No, Judge O'Malley. There was a 2004 settlement agreement in June of 2004, and Catherine had filed and started receiving OPM payments in May of 2004. At that point, she was still taking the position that she was a legally authorized wife. Exactly. Even after that 04, that first settlement agreement, Catherine, in effect, repudiated the settlement agreement. There was a continuing ongoing dispute as to who was the lawful widow of Don King in the eyes of Montana. As part of the 2004 settlement agreement, did not Diana waive a recovery to that money to the retirement benefits? I think that's a reasonable interpretation of that contract, because when you look at the language in that contract, there's a paragraph that specifies that Catherine is either to transfer the annuity payments to Diana or to OPM. What happened, actually, was that Catherine transferred the payments to Diana via the court trust or via Diana's attorneys. On top of that ... That's actually one of my biggest problems with your case, and that is that why didn't she just return the money to OPM and say, Diana, you want it? You convinced them you're the wife. Your Honor, in hindsight, that probably would have been the better thing to do, but I think what's important to keep in mind is that this is all in the context of a state court narrow dispute, where you have state court attorneys who aren't really familiar with what's going on in the federal realm of OPM annuity payments. They're exchanging other property, right? Trucks and cars and everything else is a part of that. Yes. Yes, Judge Rader. Now, why doesn't Catherine just sue Diana for unjust enrichment? Give me the money back. You already got it from the government. Again, we point out in a brief, Judge Rader, that's a possibility, but the way things stand now is that that dispute in the Montana State Court is resolved. When you look at what happened in terms of settlement agreements, the intent of the parties with respect to Diana and Catherine was to resolve the state court dispute and the payments of the OPM annuity money were taken care of because it had been transferred. Aren't all the state court disputes dismissed or credited us? Yes, Judge Rader. Right. Well, how could she sue in a state court? Well, you could always... A litigant could always try to reopen through Rule 60B, a Rule 60B procedure. But you'd have to set aside the 2008 settlement, wouldn't you? Because you waived all rights to that money. Yes, Judge O'Malley. And I think that's one of our points in the brief, and when you look at what the board did, the board and even OPM now says that Catherine had a viable route to go through Montana State Court. And conceivably, it might be viable in some small percentage of chances, but that wasn't the proper standard to ask or answer that question. It's whether it was reasonable to think that that's a proper alternative or a possible alternative. And that's all substantial evidence asked for. I mean, you would have to completely set aside that settlement, would you not? Yes, Judge O'Malley. Because that waiver was a critical provision, correct? Yes. Now, we often review cases under a standard to review a substantial evidence, but it seems to me that in this case, the OPM regulations specify whether there's substantial evidence of detrimental reliance. And it seems that the administrative judge ruled that there was no evidence of detrimental reliance or insufficient evidence. And it seems to me that that's mixing up that standard of review. We're not reviewing the AJ's determination for substantial evidence, are we? Aren't we reviewing whether Catherine, whether she supplied substantial evidence that she detrimentally relied on the overpayments? I think, ultimately, that's what the question being reviewed here is. You have to determine whether Catherine did provide substantial evidence. One way to get there is whether the board applied the proper standard, because the board is going to review the AJ's decision. And really what the board did is review the evidence, de novo, in fact. But when you look at the language that the board used, clearly they were looking for more than substantial evidence. At the end of the day, when you look at this record, if the court were to affirm this, what the court is basically saying is that this case could not have gone to a jury if this were a jury context. Because that's what the Supreme Court has said all that substantial evidence requires. The court has said on multiple occasions that if you have enough evidence to get to the jury, then you have substantial evidence. One other question before you run out of time. My understanding is that the state court set up the trust account. Yes. So the payments that Catherine made to that trust account, were they ordered by the court? I believe that's how the record stands, in that they were part of the court order, or part of a stipulated agreement between the parties, between Catherine and Diana, while that dispute was ongoing. So that basically, Catherine was putting the OPM monies into an SBIR account until the issue was finally resolved, basically through the settlement agreement. I see I'm in my rebuttal time, so I'll save a few minutes. Thank you, Mr. Dodd. Thank you, Mr. Dodd. Mr. Jabbour? Good morning, and may it please the court. This case boils down to a few key points. First of all, OPM was not a party to the settlement agreement between Catherine and Diana. OPM had no knowledge of the settlement agreement. If there is any misunderstanding... Mr. Jabbour, I've rarely seen a case with more convoluted facts, if I can use that characterization. What kind of a procedure do you have to take that into consideration? This really does call for some kind of special scrutiny, not just a rote legal analysis. Was that kind of procedure undertaken at OPM? OPM did carefully analyze the facts of the case, and OPM concluded that it really only had one proper course. OPM has to pay the survivor annuities to the person who's the legal spouse under by statute. If they had made a careful examination of the facts, they would have found that the money paid to Catherine had at least in part been transferred to Diana. Would that have affected your judgment as to how much or whether you would pay Diana? It's not OPM's responsibility to do that examination. As to Catherine coming forward and telling them that, Catherine didn't do that until April of 2008. But you argue that your responsibility was to pay the money to the legal spouse. And the issue at that time was who was the legal spouse. Correct. So you don't take an interest in that issue? No, we do take an interest. In February of 2008, Diana came forward with the following evidence. She came forward with a settlement agreement that said that she and not Catherine was the spouse. She came forward with a Montana state court order upholding the validity of that settlement agreement. Did she present any evidence or any information about payment she had received from Catherine? No, she did not. She did not. Not as far as we know. There's none in the record. Given that she was the one making affirmative representations to you to have the money be paid to her, why doesn't OPM believe that the overpayment should be recaptured by OPM from Diana? Because OPM properly paid Diana. OPM has to pay the legal spouse. But you also properly paid Catherine, didn't you? No, we don't believe we did. Well, that in hindsight says no, but at the time you made the payment, and you just got through saying that OPM pays to the legal spouse. You paid to Catherine because you thought she was a legal spouse. Correct. Based on Catherine's incomplete version of the facts, and I do want to make... But she thought she was a legal spouse at that time, and was making the argument in 2004 that she was a legal spouse. I had a marriage certificate. Well, I do want to actually clarify that. I do want to clarify the timeline here. In June of 2004, she entered into a settlement agreement that said exactly as follows. Cathy acknowledges Diana's claim to a common-law marriage with Don. As such, Cathy shall seek and consent to a decree of invalidity or annulment of her marriage to Don. That's at page 68 of the record. Right. Now, at that point, she's already getting payments based on her marriage certificate. You know, that's not... The payment started in May. That is not actually substantiated by the record. At page 417 of the record, Cathy began receiving payments in June of 2004. She received retroactive payments going back to May. So it's not clear which came first. But in any event, at least by the time the settlement agreement... But what she made the request was... You're not telling me OPM started paying her the day she made the request. I know how the government works. They don't work that fast. Well, sure. We don't have the date that she made the request in the record. All right. Clearly, it predated the settlement agreement. I don't think we can... We know that on the basis of what's in the record. We know that she began receiving payments in June of 2004. And that's at page 417 of the record. And we know that in June of 2004, she also acknowledged that she was not the wife of Mr. King. Now, so for three years, Cathy... No, but then she tried to set aside that settlement agreement. Right. And in 2005, the court upheld that she was not the wife of Mr. King. So no later than 2005, she knew that her attempt to invalidate her statement that she was not Mr. King's wife was unsuccessful. She knew that she was not Mr. King's wife. Right. So that's why she's paying all this money over into the court-ordered account. She's not taking that money. She's not keeping that money. And so why isn't it that Diana's representations to you were the ones that really contained serious material omissions when she said she was entitled to that money going back to the very beginning? Well, I don't know that Diana made any specific representations about when her entitlement began. Diana properly claimed that she was Mr. King's wife. That was a proper representation. The person who basically accepted payments for at least two years after she knew that she had... Did she also claim that she had received funds from Catherine? You know, it's not in the record that's exactly what she represented to OPM. But I will say that OPM did not have knowledge of the funds being transferred. But that's a critical point. If OPM, if the parties that presented the settlement agreement had made OPM aware of the settlement agreement, OPM was not a party to the settlement agreement. And OPM should not be bound by what these parties privately negotiated. I see an inconsistency in your argument. I mean, you're pointing us to the June 2004 settlement agreement in order to support part of your position. But yet, you don't want to look at the entire agreement and you don't want to look at the entire facts and circumstances surrounding that agreement in order to get a complete picture of what was going on. Aren't you, like, cherry-picking out of the record facts to support your position and yet not looking at the entire picture painted by the record? No, I disagree, Your Honor, respectfully. We think that OPM acted properly here in awarding it to Diana. There's no dispute in this case that Diana's the proper wife. When Diana represented she was a proper wife, you're saying you had already made payments to Catherine. That's correct. So now you have two people representing themselves to be the spouse of Don King. Doesn't that present a dilemma within the agency as to who's the right wife? Right, and eventually OPM did realize when Catherine presented this dispute, because Catherine said, you know, there's no dispute. OPM at first, Diana presented enough evidence to substantiate that she was the wife. When Catherine presented the dispute, did you look at the entire record and determine whether transfers of money had taken place between Catherine and Diana via a state court-ordered trust fund? Yes, we absolutely did. OPM absolutely did look at Catherine's April 2008 letter where she said that she had transferred the money to Diana. But OPM's position in this case is very simple. OPM doesn't want to do an accounting of money that was paid from Catherine to Diana. And I think Your Honor's question to my opposing counsel just highlights a point. Diana, I'm sorry, Catherine was paid approximately $41,000 and yet the board found that through some complicated accounting it found that she had only transferred $33,000. So is this a burden that we're going to... Was the difference just the tax though? No, that was not a difference. The difference was that she did not transfer all of the money. So are we going to say that OPM is required, before it made the payment to Diana, to ask Diana, hey, did you receive any money from anyone else? And also, can you give us an accounting of all the money? And through what mechanism you got the money? That's a really complicated burden for OPM. Here's the problem. When you first look at this, if you come at it from the perspective of someone like me who's done a lot of basic contract work and as a district court judge you say, oh yeah, this makes sense, who's at fault here? But that's really not the framework we're operating under. We're operating under a framework where there are regulations that presuppose that OPM made payments that they shouldn't have made, that were improperly made. And then there's a regulation that says,  regardless of whether OPM says, well, you know, it really wasn't our fault that we made this overpayment. So you have to operate under that regulation. You seem to be arguing more basic contract principles, which I don't think apply when you look at the regulations. The regulations say even just simple financial hardship would excuse paying back money that they shouldn't have received. Right. And we believe the board decision on the equity and good conscience standard is supported by substantial evidence. And I can go into the equity and good conscience text. First of all, with respect to financial hardship, that is not an argument that was raised. But it wasn't raised at an independent financial hardship prong, but it is always relevant to the unconscionability prong, is it not? Well, the unconscionability prong is more flexible. But it includes an assessment of ability to pay, correct? It could. Regardless of whether you call it financial hardship, it includes an assessment of ability to pay. It could. I do want to emphasize, though, that OCAM did ask Catherine for evidence of financial hardship, and she didn't produce adequate documentation, nor do I believe it's accurate. The record indicates that Catherine had income of less than $20,000 in 2005-2006. That was her income, $20,000 for the year, yet she managed to transfer $33,000 into this state court-ordered trust fund. Right. We're not disputing that the source of those proceeds that she transferred into the trust fund at least appears to be the money. And by the way, the appendix shows that the difference between the $33,000 and the $40,000 was the federal income tax. That's at JA0013, right? Well, I'd have to look at 13, but at page 26 of the record, the board does find, and the administrative judge says this, I find the appellant paid the intervenor $33,563.94 of the $41,939 in survivor injury benefits she received from OPM. But I do want to go back to the financial hardship point, because it hasn't been brought up by the appellant here, and we don't have any evidence in the record whatsoever to know if Catherine has other assets from which she could repay this. We have the income tax records. Oh, sure, but income taxes don't reflect any property assets you may have, any stocks you may own. Income taxes alone, I mean, if you have five vacation homes, it might not necessarily be reflected on your income taxes. Really, we're talking about an individual with $20,000 in income, annual income, and you're saying you may suspect she has ownership in stocks and airplanes and yachts. I'm just saying there's not enough evidence in the record to conclude one way or another. If she wanted to present evidence of financial hardship to OPM, which OPM requested, she could have done so. But turning to the other, but she chose not to do so. So I don't think based on income alone we can reach any determination as to whether or not financial hardship has been demonstrated. And, again, she didn't raise it below. If you look at the settlement agreements, they were exchanging pickup trucks. They were not exchanging artwork and real estate. I mean, it's pretty obvious what we're looking at in terms of financial structure here. I think the financial hardship analysis requires more than just simply producing income tax returns. But this isn't a financial hardship analysis. This is an analysis that under the unconscionability has just a prong that says you look into ability to pay. And all she has to do is present a very minimal level of evidence. You look at the regs and it discusses the fact that all they want is something more than a mere statement. Well, the unconscionability, I'm not exactly sure what Your Honor is referring to, but the unconscionability doesn't speak exactly in terms of ability to pay. And I think we want to avoid conflating them because if unconscionability could encompass financial hardship or ability to pay, then it would swallow the financial hardship prong. There would be no reason to have a separate financial hardship prong. Mr. Doud started with the argument that the Board misapplied the standard, which substantial evidence is a pretty low evidentiary standard, but unconscionability is a very high substantive standard. Do they get that right? That's correct, Your Honor. I mean, to analogize to a completely different context, if you're in a criminal case and the burden is beyond a reasonable doubt, it could be beyond a reasonable doubt for first-degree murder in terms of the prosecutor's burden. It could be beyond a reasonable doubt for negligent homicide. One of those is easier to prove than the other one. Just because it's a high standard, it doesn't mean it's incongruent with the burden of proof. So here, even though the substantial evidence standard may not be a high evidentiary burden, nonetheless, the unconscionability standard is a high one and should only be entertained in exceptional circumstances. It is exceptional. That's where we're all going. No, this really is not. I haven't seen many cases that come close to this. The unconscionability, the examples given in the overpayment guidelines are very instructive, and those examples require some sort of extreme fault by OPM. Usually where someone contacts OPM and says, hey, I'm not sure if I'm supposed to be receiving this money, can you tell me? And OPM gives them the wrong information. Or were there some sort of mental or incapacity of the person or limited education such that they didn't understand what was going on? And there's no evidence to the record of that sort of unconscionability. Did either Diana or Catherine really understand what was going on until the Montana court finally told them who was the wife? One had a marriage certificate. One had lived with the guy for 18 years. Diana understood. I'm sorry, Catherine understood no later than 2005 that she was not the wife. Montana State Court had upheld the settlement agreement indicating that. And I do think that Catherine still can get relief. I think it's very suspicious that she filed a Rule 60d motion in state court and then she voluntarily stipulated to dismissal of that case. But even apart from Rule 60 motion, she could bring a breach of contract action, saying this is never what we intended under the settlement agreement, or she could simply even just try to resolve this privately with Diana. But I don't think it's this court's role, especially where OPM was not a party to their settlement agreement, to say that OPM should now be prohibited from recovering an overpayment because of their settlement agreement. So for those reasons, we respectfully request that the court affirm the court's decision. Thank you, Mr. Jabbour. Mr. Dowd, you have a couple minutes. Thank you, Chief Justice Brader. I will keep it short as the snow is accumulating outside. Judge Romali, in addition to the pickup truck, just to give you some context in terms of what was in the settlement agreement, they transferred a big gun with a bayonet, a lion rug, and another rifle. I mean, that's sort of the property that's being transferred under the settlement agreements. My colleague mentioned that it was in 2005, when Diane Catherine acknowledged that she was not the husband of Don. And when you read the record, I do not think that's a fair or accurate characterization because the Montana State Court didn't decide it until much later. And in addition, Diana did not file for annuity payments until October of 2006. So I think it's pretty clear from this record that there was this ongoing dispute, at least until 2008, as to who was the proper widow. What is your response to your friend's argument that ability to pay or the personal limitations of the annuitant don't come into play in an unconscionability analysis? Your Honor, I've seen no case that discusses unconscionability and also ignores some element of financial hardship. OPM hasn't cited a single case for that proposition, and I just think in general judicial precepts and concepts, that's not correct. And I haven't seen any decision from this Court that says that either. As to the high standard, it's just not possible to describe this as a high standard and be consistent with the substantial evidence standard. Unconscionability refers to exceptional circumstances, unusual cases. And I need once more for you to answer, how do we know that she transferred the $40,000 she received from the government to Diana? When you look at the A.J.'s finding, that's what the A.J. found. When you look at the receipts that are in the record... The A.J. seems to equivocate on that. They said she transferred $33,000, not $41,000. Even if it's $33,000, I think that goes to the point that this is an incorrect decision by the Board. Whether it's $33,000, $41,000, $40,000, at a minimum in this instance, Katherine should have received at least a partial waiver for whatever amount that was determined she had transferred from her to Diana. With that, I'm out of time, Your Honor, unless there are any other questions. Thank you, Mr. Dowd.